UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

EXPORT DEVELOPMENT CANADA,                 :

                      Plaintiff,           :
                                                      03 Civ. 2063 (HBP)
        -against-                          :
                                                      OPINION
ELECTRICAL APPARATUS &                     :          AND ORDER
POWER, L.L.C. and
AMERICAN MANUFACTURERS                      :
MUTUAL INSURANCE COMPANY,
                                           :
                      Defendants.
                                           :
----------------------------------X


        PITMAN, United States Magistrate Judge:


I.  Introduction


        This action arises out of the plaintiff's assignor's

sale of 102 flowmeters to Electrical Apparatus & Power, L.L.C.

("EAP").  The flowmeters were installed in the New York City

sewer system and were intended to provide remote reporting,

through a connection to the internet via cellular telephone

facilities, of certain unusual events in the sewer system.  There

is no real dispute that the system worked for only a short period

of time before failing, although the parties vehemently dispute

the cause of the failure.  EAP paid only $399,000 of the

$1,074,190 billed to it, leaving an unpaid balance of $675,190.00.[1]  It is this unpaid balance of the purchase price that plaintiff seeks to recover here.

The parties consented to my exercising plenary jurisdiction over this matter pursuant to 28 U.S.C. § 636(c), and the matter was tried before me, without a jury, on June 12 through June 16, 2006.  Based on the testimony and other evidence offered at trial and the parties' pre- and post-trial submissions, I make the following findings of fact and conclusions of law.

II.  Findings of Fact

A.  The Parties

1.  RMI was, at relevant times, a corporation incorporated under the laws of Canada and/or the Province of Alberta, Canada having its principal place of business at 4755-76th Avenue, Edmonton, Alberta, Canada.  Although RMI still exists as a corporation, it is no longer operating (Tr. 11).

---

[1]The record is inconsistent concerning the total amount plaintiff's assignor, Rocky Mountain Instruments Inc. ("RMI"), billed to EAP.  In his opening statement, RMI's counsel represented that the amount was $1,173,225 (Tr. at 6).  The invoices offered at trial totaled $1,074,190 (Plaintiff's Exhibit ("PX") D1-D11).  And during his cross examination of EAP's principal, RMI's counsel elicited a stipulation that the total amount invoiced was $1,022,375 (Tr. 646).  I conclude that the most reliable evidence are the invoices, and that the true amount charged to EAP is $1,074,190.

2.  Among other things, RMI manufactured and sold flowmeters for installation in municipal sewer systems.  These devices can detect, record and report specific events such as effluent levels above a certain threshold, flow direction and velocity.  RMI's flowmeters were designed to report events to a monitoring entity through a combination of cellular telephonic communications and the internet, i.e. the flowmeters would connect to the internet through a cellular telephone connection and report designated events.  The flowmeters consist of a cylindrically-shaped canister, containing electronic components and batteries, to which sensors and an antennae are attached (Tr. 543-44, 552, 569; DX 163-A-I).

3.  RMI manufactured and sold to EAP the flowmeters that are the subject matter of this action.

4.  Defendant EAP is a limited liability company organized under the laws of the State of New Jersey, which, at relevant times, had its principal place of business at 10 South River Road, Cranbury, New Jersey 08512 (see Tr. 597).

5.  At all relevant times, EAP was an electrical contractor; its work up to 2001 included maintaining electronic supervisory, control and data acquisition ("SCADA") systems, bidding on New York City projects, building control systems for the New York City Transit Authority and building a wound rotor for the New York City Department of Environmental Protection

3

("DEP") (Tr. 507). As discussed in more detail below, EAP entered into a contract with the DEP to install flowmeters at selected locations in the New York City sewer system; it purchased these monitors from RMI.

6. Defendant American Manufacturers Mutual Insurance Company ("AMM") is a corporation incorporated under the laws of the State of Illinois having its principal place of business at 1 Kemper Drive, Long Grove, Illinois 60049-0001.

7. AMM is the issuer of three payment bonds relevant to the dispute in this matter: (1) bond 3SE 995 181-00 with respect to "Contract REG-23A" between EAP and the DEP (PX G-1); (2) bond 3SE995184-00 with respect to "Contract REG-23E" between EAP and the DEP (PX G-2), and (3) bond 3SE995185-00 with respect to "Contract REG-23F" between EAP and the DEP (Tr. 612; PX G-3).

8. Plaintiff Export Development Canada ("EDC") is a Canadian government-affiliated Crown corporation having its principal place of business at 151 O'Connor Street, Ottawa, Ontario, Canada K1A 1K3 (see Tr. 416).

9. EDC is engaged in the business of promoting exports by Canadian companies (Tr. 416).

10. One of the ways in which EDC accomplishes its purpose is to underwrite export trade receivables of Canadian corporations. It provides "accounts receivable"/credit insurance

which, effectively guarantees a Canadian exporter that a foreign
buyer will pay for the Canadian goods (Tr. 416-18).

11.  On or about April 10, 2001, EDC issued to RMI an
Accounts Receivable Policy (Shipments) No. GG1-21534, dated April
10, 2001, having a policy period of April 1, 2001 to March 31,
2002 (the "Receivables Policy")(Tr. 419-21; PX LL).

12.  RMI filed a claim in September 2001 against the
Receivables Policy certifying that it had not been paid by EAP
and was not aware of any dispute with respect to the transactions
(DX 141).  EDC paid RMI's claim, and, in turn, received an
assignment of RMI's claim against EAP (PX NN).  EDC commenced
this action pursuant to that assignment.

B.  The Contract
    and its Formation

13.  In or about June 1999, the DEP consented to the
entry of an Order against it by the New York State Department of
Environmental Conservation concerning, among other things, the
discharge of untreated sewage by New York City (DX 1).  Among the
issues the consent order addressed was the problem of "bypasses."
In certain areas in New York City, storm sewers and sanitary
sewers share common pipes.  Although the contents of these pipes
are ordinarily processed by sewage treatment plants, certain
events, such as malfunctions at the treatment plant or a surge in
the fluid levels in the sewers resulting from a rain storm or

5

similar event, can result in a "bypass" in which untreated sewage is discharged into the waterways surrounding New York City (Tr. 43-44). In order to monitor these bypass events, Omnibus Order IV, issued pursuant to the 1999 Consent Decree, required, among other things, that the DEP install 102 monitors at certain locations that would provide alarms to the DEP of bypass events (DX 1, Omnibus Order IV at 68-71).

14. In order to comply with the Consent Order, the DEP issued Invitations for Bids for three contracts, designated Reg-23A, Reg-23E and Reg-23F, respectively (Tr. 51; PX F-1, F-2 and F-3).[2] Each contract had two components (1) the installation of flowmeters that would record and report bypasses and (2) the preparation of periodic reports to the DEP based on the data transmitted by the monitors.

15. Prior to 2002, RMI had successfully installed similar flowmeters in Seattle, Washington and Springfield, Massachusetts.

16. EAP was the successful bidder on contracts Reg-23A, Reg-23E and Reg-23F (PX F-1, F-2, F-3; DX 15, 16, 20, 32).

---

[2]For reasons the record does not disclose, the DEP did not issue a single contract for the installation and monitoring of all 102 flowmeters, but rather divided the work among the three contracts discussed in the text which provided for the installation and monitoring of 38, 36 and 28 monitors, respectively.

17. EAP had never previously been involved a similar project (Tr. 507, 520, 610), and, in order to fulfill the three contracts with the DEP, EAP turned to and ultimately entered into a contract with RMI.

18. EAP's principal, Louis Romola, first had contact with a representative of RMI -- Clark Harris, RMI's vice president -- during a pre-bid meeting in connection with the DEP contract (Tr. 508-10). Harris attended the pre-bid meeting "to familiarize himself with the needs of the city in order to attempt to fulfill those needs." Harris also attended this meeting with the goal of "find[ing] a partner, somebody to partner up on this contract with" (Tr. 162-63, 508-10).

19. At the bidder's meeting, Harris approached Romola, a founder and partner of EAP, and introduced himself. After the meeting Harris telephoned Romola and invited him to bid with Harris on the project (Tr. 508, 510). The two of them subsequently "got together and discussed [their] roles in th[e] project and what it would be and what [RMI] had to offer, and [Harris] made it very clear to [Romola] that he had done a project, he was familiar with these sewer systems, that is what they [RMI] did," so they "sat down and [EAP and RMI] laid out the bid" (Tr. 510).

20. EAP and RMI had a number of discussions concerning the work to be done prior to entering into a contract. In

advance of these discussions, RMI had become familiar with the
three DEP contracts and "with the specifications for the New York
City contract" (Tr. 160-61) and RMI's principals understood there
was "a consent decree from the EPA [and a] governmental require-
ment that the city monitor combined sewer overflow . . . because
. . . it is a potential environmental hazard" (Tr. 161; see also
Tr. 162-63, 508-09 (RMI familiar with underlying contract through
attendance at pre-bid meetings)).

     21.  Thus, RMI, at the time of contracting knew the
particular purpose for which the monitoring system was required,
and the specific issues the DEP contracts were intended to
address.

     22.  To induce EAP to purchase its monitoring system,
RMI represented that "RMI meets the complete intent of the [DEP's
contracts]" (DX 167).

     23.  One of RMI's principals -- Steven Bot -- acknowl-
edged that he and RMI "were aware that there was a project going
on, there were bid specifications out there that the city was
looking for someone to supply a system" (Tr. 190).

     24.  Harris of RMI and Romola of EAP reviewed the bid
documents together and assessed what EAP would need to accomplish
the job.  As Romola testified:

> He [Harris] described my manpower needs.  Again, I had
> no idea at the time what his equipment entailed, what
> my responsibilities outside the equipment would be.  So
> we clarified that they were the experts.  They knew

8

what they were going to supply.  He told me how much
manpower to apply to the job.  We discussed each dif-
ferent aspect of it as far as -- we went down to de-
tailing as far as whether or not we needed to visit the
sites every week.  It was clear to me that -- he said
to me I would not need to do that, that they had tech-
nology that, since they are transmitting data back, it
would not require weekly visits to these sites.  He
told me how many men in a truck I would need to main-
tain the sites once they were installed.  We plugged in
all the numbers.  He told me how much money to bid the
job at based on his experiences on previous jobs.  He
knew our competition was going to be ADS at the time.
I guess the company is ADS.  We laid it out based on
what he had for numbers on ADS's jobs in another part
of the country, and we put the numbers in the blanks
and filled in the blanks.  So I was relying on him
completely to tell me what pieces of the manpower I
would need to bid the job, and even price it up.

. . . .

    He gave me a background as far as was they in-
tended to provide.  He was very clear about the pieces
of software they are going to develop for me, the web
site, the individual equipment, and how it would func-
tion.  At that point he wasn't telling me the model
numbers or anything like that.  We weren't at that
detailed a stage.  We were more trying to fit the
numbers to the paper, not really fitting model numbers
to the dollars and cents at this point.  So I really
didn't know what I was going to be buying in any shape
or form.  He told me he had done some trials and he had
a clear understanding of what it required.  So I left
it in his hands.

    We also made sure that I -- at the time I made
sure that he understood that since I had no background,
he was going to take responsibility for the piece, the
whole system.  If he is going to do the software, if
the devices are proprietary, if the software is his, if
the e-mailing or alarming is his, then I could have no
role in that development.  There is no physical room
for me there.  I knew that my portion of it would be
the installation and the maintenance of the hardware.

(Tr. 511-13).

25. RMI admitted at trial that it held itself out as an expert. RMI's Bot testified:

> Q. RMI, since -- as you started it, had experience and expertise in the manufacture, assembly and installation operations of flow monitoring systems, did it not?
>
> A. Correct.
>
> Q. It held itself out as having special expertise in this area, did it not?
>
> A. Absolutely.
>
> Q. And it did so with respect to EAP and with respect to the City of New York, did it not?
>
> A. As in become [sic] an expert in the field?
>
> Q. Yes.
>
> A. Absolutely.

(Tr. 168-69).

26. Harris, on behalf of RMI, also specifically represented to EAP that in order "[t]o identity the exact equipment requirements for this project a comprehensive field investigation will be provided. This will insure the best possible solution for each location and identify the system requirements for each site" (DX 167; see Tr. 166).[3]

27. RMI was also aware that EAP had limited or no expertise in telemonitoring. As Bot testified at trial:

---

[3]At trial, RMI attempted to dismiss these representations as "simply a piece of marketing literature . . ." (Tr. 190).

Q.  . . . At the time of the -- by the way, when you first started dealing with EAP, did you know them to have any particular expertise or experience in telemonitoring apparatus?

A.  I did not know anything about EAP.  Clark Harris was the direct contact, you know, contact with them.

Q.  Did you ever learn from Clark or anywhere else that EAP had any kind of expertise in telemonitoring?

A.  Clark told me that EAP was a subway contractor who installed instrumentation in the subway system.  At that point that was the only information that we really had on them.

Q.  So to your knowledge, EAP had no expertise in installing apparatus in the sewer systems, municipal sewer systems?

A.  That wasn't demonstrated to me, no.

(Tr. 168).

28.  For all the foregoing reasons, RMI had reason to know, prior to the formation of the contract between them, that EAP was relying on RMI's skill and judgment to select and furnish a suitable monitoring system.

29.  During their pre-contract negotiations, EAP and RMI had discussions concerning the useful life of the batteries that would be installed in the flowmeters.  Battery life was a material issue due to the substantial effort it would take to replace dead batteries.  In order to replace batteries, a mainte-nance crew would have to travel to and enter the location in the sewer system where the flowmonitor was installed, open the cannister, replace the batteries and reseal the cannister (Tr.

516-18).  During their negotiations, RMI represented to EAP that "the batteries would last 18 months, but [RMI will] put in writing a year . . . .  So [EAP] was expecting a year life out of each battery" (Tr. 516, 551; <u>see</u> <u>also</u> (Tr. 195; DX 6 (RMI represented to DEP that its equipment would have "ONE YEAR POWER SUPPLY")).

30.  RMI also represented to EAP that it would provide a "Factory Technician on location to train service and installation crews" (DX 7, 8)

31.  The EAP-RMI Contract was subject to and incorporated the terms of EAP's contract with the DEP (Tr. 202-03, 210; PX B, B1; DX 7, 8, 18).  These terms included the following:

- **D-0.3 <u>INTENT OF WORK:</u>**  The intent of this contract is to have a Contractor completely furnish, install and make fully operational a regulator's outfalls dry weather bypass alarm/tidal inflow notification telemonitoring system for each of the 38 CSO locations listed in Table 1) page D-7. . . .

(PX F-1, F-2, F-3, all at page D-1)

- D-1.2 **DESCRIPTION OF FLOW MONITORING SYSTEM:**  The services under this contract are related to the installation outflow monitoring equipment at each of the 38 sites which at a minimum, must demonstrate the ability to send an alarm/notification the instant a bypass/tidal inflow event occurs and to determine, record and transmit:

  - depth of flow;

  - direction of flow;

  - velocity of flow; and

- duration of flow.

(PX F-1, F-2, F-3, all at page D-10).

- D-5.4 **OVERALL SYSTEM UPTIME GUARANTEE:** The Contractor shall guarantee with standard operating procedures overall telemonitoring system-wide uptime during the operation and maintenance period will exceed 80% per month.

(PX F-1, F-2, F-3, all at page D-17; see also Tr. 36 (RMI's Steven Bot acknowledged that this "was part of the requirements that the city had that [RMI] in turn agreed to fulfill in [its] agreement with EAP."), 210).

- Contract Item 6. **Reporting Services:** Section D-6.1 to D-6.4. The Contractor shall prepare and submit monthly and supplemental reports as described in this division.

(PX F-1, F-2, F-3, all at page D-2).

32. RMI also expressly agreed to warrant the system, the warranties to run from the date of acceptance of the system by the DEP (PX B1, DX 18).

33. At no time during its negotiations with EAP or in the contract itself did RMI attempt to disclaim any warranty (see Tr. 188; PX B, B1; DX 18).

34. On December 15, 2000, EAP formally contracted with RMI to supply the monitoring and alarm system and to provide reporting to the DEP (the "EAP-RMI Contract") (Tr. 33, 34, 516; PX B, B1, C, CCC; DX 17, 18). The EAP-RMI Contract included six purchase orders issued by EAP to RMI for equipment and monitoring services (Tr. 47-48, 160; PX C). RMI remitted invoices totaling

$1,074,190 for the orders reflected in these purchase orders (DX
D1 - D11).

     35.  Among other things, the EAP-RMI Contract provided
that:

> The above referenced purchase order is for a complete
> and operational system.  This system consists of all
> hardware and software (less personal computers) needed
> to form a fully functional system.  This system will
> consist of [102] flowmeters with full telecommunication
> capability.  Rocky Mountain will also ensure that the
> system meets NYC DEP SPECS. REG 23A and will abide by
> it's [sic] terms and conditions.

(PX B, B1; DX 18).

     36.  The EAP-RMI Contract also provided that "Rocky
Mountain Instruments agrees to provide a two year warranty on the
flowmeters and batteries" and that it "shall extend the warranty
to the satisfaction of the NYC DEP" (PX B, B1; DX 18).

   C.  Performance of the
      EAP-RMI Contract

     37.  Despite the fact that RMI had successfully in-
stalled its Models 2000 and 2001 in other cities and had success-
fully demonstrated the use of the Model 2001 in a test project in
New York City (DX 6), it delivered a new model in connection with
the EAP-RMI Contract -- the Model 3000.  The Model 3000 had never
been used in any installation that involved 25 or more units, and
by the end of July 2001 the product was no longer being produced

(Tr. 232-33). EAP did not even know that the Model 3000 existed until deliveries started in May 2001 (Tr. 521).

38. RMI was solely responsible for the design of the Model 3000 and for selecting the various critical components comprising the telemonitoring system. RMI's own principal, Steven Bot, expressly admitted this fact at trial:

> Q. Is it fair to say that RMI decided what components would comprise the telemonitoring system that would be sold to EAP?
>
> A. RMI designed the 3000 --
>
> Q. Yes.
>
> A. -- with the contract specification in mind, which was provided by the DEP.
>
> Q. And so RMI would match from different choices of components, it would match those to try to fit the DEP needs, would it not?
>
> A. Correct, and hence the reason of the pilot project. . . . .
>
> Q. So EAP would -- let's put it direct. Who decided what kind of modem would go into the Model 3000?
>
> A. RMI.
>
> Q. Who decided what kind of datalogger would go into the Model 3000?
>
> A. That was decided by Optimum Instruments in conjunction with RMI.
>
> Q. And approved -- but RMI chose to put an Optimum datalogger into the Model 3000, correct?
>
> A. Correct.

Q.  And RMI chose the antenna to put into the Model 3000, did it not?

A.  Correct.

Q.  And RMI chose the battery type of battery to put into the Model 3000?

. . . .

A.  OK.  Correct.

. . . .

[Q.]  Now, in terms of the depth sensors, RMI chose what type of depth sensor would be appropriate for this particular -- for the Model 3000, did it not?

A.  Correct.

(Tr. 169-71; see also Tr. 551, 565).

39.  RMI also chose the cellular telephone service provider the system would use (Tr. 574).

40.  Despite RMI's representation prior to the formation of the contract that it would provide a "comprehensive field investigation" "[t]o identity the exact equipment requirements for this project" (DX 167), RMI admitted that it did not perform such an investigation, and that at best, its "field investigation consisted of two site [visits]" (Tr. 191-92).

41.  RMI started shipping components for the system in March-April 2001, and a field technician -- Steven Schaller -- was sent to EAP's facility in New Jersey on April 3 or 4, 2001 (Tr. 304).  Schaller had graduated from "university" in 2000 and testified that he had two degrees, namely "a diploma in environ-

mental engineering technology and a bachelor's degree in environmental studies" (Tr. 393). The nature of these degrees is unclear, but Schaller testified that his "diploma in environmental engineering" was "lower" than a bachelor's degree (Tr. 393). Schaller's job at EAP's facility was to unpack the units as they arrived from RMI's factory in Canada, test them and provide instructions to the crews that were going to install the units (Tr. 58-61, 90, 501, 701; DX N). The units did not come with any manuals or instructions (Tr. 396-97, 501, 564).

42. Although RMI offered testimony that every unit was throughly inspected and checked before it left the factory (Tr. 57), no documentary evidence concerning such testing was presented. No quality control "check list" was presented, nor was any documentary evidence offered to show that each unit had, in fact, been tested and had, in fact, passed.

43. Similarly, although there was testimony that Schaller tested every unit when it arrived in New York to ensure that it was working properly (Tr. 61, 96-97, 305), no documentary evidence of such testing was offered.

44. The units were actually installed in the sewers by crews from EAP, Rose Electric and Savin Electric (Tr. 306-07, 380, 608-09, 700).

45. As of late May or early June 2001, all the flowmeters had been installed but the monitoring system was not

17

fully functional (Tr. 288, 568, 571).  Although the units could be "pinged" at that time, pinging merely established the existence of a communication link to a flowmeter; it did not transmit any useful data (Tr. 569-71, 701).

46.  Shortly after all the monitors were installed, the batteries that powered the units began to fail much more promptly than expected.  Some batteries died within three days (Tr. 572-73).

47.  According to RMI's own survey, the number of working units dropped off sharply after the first week of June, 2001.  RMI reported the number of working units as follows:

| Week of | Percentage of Units Working |
|---------|------------------------------|
| 5-28-01 | 85% |
| 6-04-01 | 86% |
| 6-11-01 | 71% |
| 6-18-01 | 49% |
| 6-25-01 | 44% |
| 7-02-01 | 33% |
| 7-09-01 | 39% |
| 7-16-01 | 35% |
| 7-23-01 | 18% |
| 7-25-01 | 13% |

(PX AA, Y; see also Tr. 705; DX 57, 89, 136A).

48.  RMI blamed the battery failures on excessive usage
(Tr. 526, 702).  Specifically, RMI has asserted that the failures
were attributable to the absence of rain gauges.  A rain gauge
can prevent an alarm from being sent when the alarm is attribut-
able to a heavy rain.  Thus, a rain gauge limits the number of
alarms (Tr. 133-34).  No evidence was presented suggesting that
there was unusually heavy precipitation in New York in May or
June 2001, and thus, no connection was established between the
absence of rain gauges and the short battery life of RMI's units.

49.  RMI also attempted to blame the high failure rate
on defective installation.  Specifically, RMI asserted that
improper techniques were used by the crews that installed the
units, including the use of sledge hammers.  However, RMI's
representative in New York -- Steven Schaller -- testified that
he saw a crew utilizing a sledge hammer to install a unit only
once but that he saw marks on approximately 29 other units
suggesting the use of a sledge hammer (Tr. 323-25).  The one
instance that Schaller claims to have observed cannot be respon-
sible for the system-wide failure of the units.  In addition,
there was nothing in Schaller's background suggesting that he was
competent to deduce the cause of a mark on a unit from a visual
inspection of the unit.

50.  RMI also asserted that the installation crews
lacked necessary equipment such as buckets (used to lower equip-

ment into manholes), voltmeters, alan keys and laptop computers (Tr. 368-70; PX2) and that on at least one occasion, a member of an installation crew used cocaine on the job (Tr. 355-56). Again, RMI has not offered any evidence connecting these putative deficiencies and the act of misconduct to the specific problems the flowmeters experienced. In addition, the only installation deficiency that Schaller noted in a contemporaneous document was crews' burying antennae too deeply (Tr. 701).

51. Substantial evidence was offered, and I find as a fact, that the units failed as a result of deficiencies in their components which were manufactured by a company named Optimum Instruments (Tr. 55, 56).

52. In an RMI document entitled "IMPACT REPORT CON-CERNING 'OPTIMUM' DATA LOGGERS and RE-CUR[R]ING MEMORY CHIP ISSUES" dated June 19, 2001 (DX 77), RMI concluded that Optimum's electronic components were defective:

> For some time now, RMI has been impacted with signifi-cant additional field costs as a result of poorly performing Model:3000 electronics. Ostensibly this issue has been linked to bad memory chips from a ven-dor, but after retro fitting newly sourced chips from an alternative supplier, the failure of the 'Optimum' build electronics is still at an unacceptable level.
>
> . . . .
>
> Comparing the performance of our existing Model:3000 monitors in the field, current tank test results on the units containing the newly-built electronics suggest there are still inherent problems with the circuitry, the communications software or possibly both.

Recently, 15 completed sets of electronic retro-fitted with new memory chips were sent to New York and 30% of these later failed.  This failure rate is consistent with the current rate of failure seen on the production test tank.  However, the electronics recently sent to New York had also undergone tank testing prior to shipping and any erroneous units had already been culled from those tested.  From discussions with Steven Schaller this morning, current statistics sho[w] that only 48% of the installed units are now operational.

Combined failure rates suggest that less than 15% of the original or the retro-fitted electronics are actually performing to specification.  Accordingly, RMI is incurring extensive addition costs, both at the manufacturing level and in the field.  Moreover, without a satisfactory resolve, these costs will continue to escalate and production schedules will slip.

. . . .

As a direct result of these malfunctioning electronics, the life expectancy of the battery packs involved is also seriously impaired.  The full extent and scope of the problem has not been defined but unit replacements, associated travel costs and extradition charges are expected to be quite substantial.

In view of RMI's current exposure with it's current customer and contract base, the seriousness of this issue and the obvious sense of urgency required, immediate discussions should commence between 'Optimum' and RMI on an executive level.

(DX 77).

53.  When asked whether anyone at RMI disclosed the information contained in the Impact Report (DX 77) to EAP, Bot admitted that he was not aware of anyone who had disclosed the information (Tr. 223-24).  EAP also confirmed that the information had not been disclosed to it (Tr. 578).  Instead, RMI told

EAP that the modems in the units kept searching for cell towers and were not turning off (Tr. 703, 705-06).

54.   The Impact Report was forwarded to Optimum Instruments.  Its oral response, along with and RMI's comments on the response, were memorialized in an RMI email prepared by an individual named John Jarman, an RMI production manager (Tr. 155).  Mr. Jarman wrote

> According to Bob [of Optimum Instruments], they do not yet have the new replacement memory chips from an alternate vendor!  They are continuing to use the old chips.  Also, their supplier of cards (Miltronics) just went chapter:11 and they can't get boards or kits from them.  They are in discussion with the Receiver.
>
> So, my understanding is, we continue to populate units with known defective chips?  Should we not have expected 'Optimum' to have at least kept us in the picture???
>
> Bob's final comment was "please don't go telling the customer we are supplying defective product"???
>
> Bob made it perfectly clear he was miffed with my report.  I don't see me getting an invitation to his next family reunion.

(DX 75).

55.   Despite the knowledge that the components used to build the units were defective, RMI sent Schaller back to New York in July to try to remedy the problems (TR. 328).  Because there was a fundamental problem with the components that was beyond his ability to repair (and probably beyond the ability of any field technical to repair), Schaller was unable to reverse the failure rate in any substantial manner (Tr. 499-501, 708; <u>see</u>

PX AA).  On July 10, 2001, Schaller reported that 82 units, out of a total of 102, had failed (DX 89).  Although Schaller kept replacing batteries, this palliative could not remedy the problem in the hardware.

56.  Shortly thereafter, EAP ordered Schaller off the project because RMI was insisting that EAP pay for his work replacing batteries notwithstanding RMI's earlier representations and warranties concerning battery life (Tr. 581).

D.  The End of the
    EAP-RMI Relationship

57.  On or about July 30, 2001, RMI and EAP met with the DEP to discuss the problems with the monitoring system (Tr. 584-85).  One of the representatives of RMI, Graham Illingworth, suggested that the DEP terminate its contract with EAP and substitute RMI as the contracting party (Tr. 586; see PX AA); that suggestion was not followed by the DEP.  The meeting concluded with an agreement that EAP and RMI would continue to work together to attempt to resolve the problems with the RMI units (Tr. 590, 718).

58.  Consistent with the agreement reached at this meeting, EAP sent a number of emails to RMI in an effort to formulate a concrete strategy to remedy the malfunctioning units (see DX 121, 123, 124, 125, 127).

59.  As a result of the ongoing problems with the system, EAP never paid the full amount invoiced by RMI; rather it paid only $399,000 (Tr. 142), leaving an outstanding balance of $675,190.

60.  Despite the fact that RMI had agreed on July 30 to work with EAP to attempt to remedy the problems, RMI simply walked away from the project almost immediately thereafter.  RMI provided no further support for the monitors and made no attempts to make further repairs.  RMI wrote to EAP on August 2, 2001 stating that "effective immediately your internet service account with RMI Rocky Mountain Instruments Inc. has been placed on credit hold and will remain suspended until the account is settled in full or alternative arrangements have been made" (PX CC; see also Tr. 149-50).  The letter further stated that, notwithstanding its warranties, RMI would service the flowmeters in the future only if EAP paid for such service in advance (PX CC).  As of August 2, 2001, only "13 percent or so" of the sites in the system were functional and RMI knew that to be the case (Tr. 214-15).

61.  After receiving these letters, EAP met with officials of the DEP to discuss the problem (Tr. 592).  The DEP expressed the opinion that EAP should not pay RMI the balance of the contract price (Tr. 592).

62. Shortly thereafter, EAP had a second meeting with the DEP at which it was formally decided to remove the RMI equipment and replace it with equipment from another supplier (Tr. 475-76). EAP's cost to remove the RMI system and replace it totaled $712,407.25; EAP also incurred $129,424.25 in unreimbursed expenses servicing RMI's system (DX 162; Tr. 595).

63. The DEP accepted the replacement system as con- forming to the contract between EAP and DEP (Tr. 475).

64. In August or September, 2001, EAP advised RMI that it should retrieve its monitors (Tr. 665-66). No one from RMI ever demanded that EAP actually send the equipment to it or otherwise indicated that RMI wanted it back (Tr. 666). The equipment remains in storage, apparently abandoned by RMI.

III. Conclusions of Law and Findings
of Fact that are Dependent Upon
the Applicable Principles of Law

   A.  Jurisdiction and
       Applicable Law

65. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) and (4) because there is complete diver- sity.

66. A federal court sitting in diversity must apply the law of the state in which it sits, including the state's choice of law rules. Klaxon Co. v. Stentor Elec. Mfg., Co., 313

U.S. 487, 496-97 (1941); <u>Lazard Freres & Co. v. Protective Life
Ins. Co.</u>, 108 F.3d 1531, 1538-39 (2d Cir. 1997).  Both plaintiff
and defendants have submitted proposed conclusions of law that
assume New York substantive law applies to this transaction;
"such '"implied consent . . . is sufficient to establish choice
of law."'  <u>Krumme v. WestPoint Stevens, Inc.</u>, 238 F.3d 133, 138
(2d Cir. 2000) (quoting <u>Tehran-Berkeley Civil & Envtl. Eng'rs v.
Tippetts-Abbett-McCarthy-Stratton</u>, 888 F.2d 239, 242 (2d Cir.
1989))."  <u>Motorola Credit Corp. v. Uzan</u>, 388 F.3d 39, 61 (2d Cir.
2004).  Accordingly, New York law applies to this matter.

67.  New York has adopted the Uniform Commercial Code,
Article 2 of which provides a comprehensive body of rules appli-
cable to "transactions in goods . . . ."  N.Y. U.C.C. § 2-102.
The contract between EAP and RMI required RMI to provide both
flowmeters and reports based on the data provided by the
flowmeters; the contract involved both goods and services.

68.  "In determining whether a contract is for the sale
of goods, and thus covered by the UCC, it is necessary to look to
the 'essence' or main objective of the parties' agreement.  If
the provision of services or rendition of other performance
predominates and is not merely incidental or collateral to the
sale of goods, then the contract will not be subject to Article
Two of the UCC . . . ."  <u>Dynamics Corp. of America v. Int'l
Harvester Co.</u>, 429 F. Supp. 341, 346 (S.D.N.Y. 1977); <u>accord</u>

<u>Triangle Underwriters, Inc. v. Honeywell, Inc.</u>, 604 F.2d 737,
742-43 (2d Cir. 1979); <u>Medinol Ltd. v. Boston Scientific Corp.</u>,
346 F. Supp.2d 575, 593 (S.D.N.Y. 2004); <u>Cary Oil Co. v. MG Ref.
& Mktg., Inc.</u>, 90 F. Supp.2d 401, 407 (S.D.N.Y. 2000).  I find
that the services contemplated by the contract in issue were
incidental and collateral to the principal purpose of the con-
tract.  The flowmeters were the heart of the contract; there were
no services to be provided independently of the flowmeters.
Thus, I find that the transaction is covered by Article 2 of the
New York Uniform Commercial Code.

    B.  The Claims and
        <u>Counterclaims</u>

        69.  EDC, as RMI's assignee, asserts three claims
against the defendants:

                    a.  breach of contract

                    b.  goods sold and delivered, and

                    c.  account stated

EDC also asserts that AMM is liable on its claims by virtue of
the bond it issued.

        70.  EAP asserts five counterclaims against EDC:

                    a.  breach of contract

                    b.  breach of express warranty

                    c.  breach of the implied warranty of mer-
                        chantability

        d.  breach of the implied warranty of fitness for a particular use, and

        e. claims under Sections 16(2), (4) of the Alberta Sale of Goods Act, Alberta Statutes and Regulations, RSA 1980 cS-2 s16(2), (4).

71. Defendants have not briefed the elements of their counterclaims under the Alberta Sale of Goods Act, and the text of the provisions on which defendants rely appears to be indistinguishable from parallel provisions of the Uniform Commercial Code.[4]  In light of the near identity of the statutory language, the absence of briefing and my determination that New York law

---

[4]Section 16(2) of the Alberta Sale of Goods Act provides:

> When the buyer expressly or by implication makes known to the seller the particular purpose for which the goods are required so as to show that the buyer relies on the seller's skill or judgment and the goods are of a description that it is in the course of the seller's business to supply, whether the seller is the manufacturer or not, there is an implied condition that the goods are reasonably fit for that purpose.

This language is indistinguishable from the provisions of N.Y. U.C.C. § 2-315 governing implied warranties of fitness for a particular use.

Section 16(4) of the Alberta Sale of Goods Act provides:

> When goods are bought by description from a seller who deals in goods of that description, whether the seller is the manufacturer or not, there is an implied condition that the goods are of a merchantable quality.

This language is indistinguishable from the material provisions of N.Y. U.C.C. § 2-314 governing implied warranties of merchantability.

applies to this case, I shall disregard the claims asserted under Alberta Sale of Goods Act.

72. Defendants have also asserted a number of putative affirmative defenses which I shall discuss to the extent necessary.

C. <u>RMI's Warranties</u>

73. Before discussing the parties' particular claims and counterclaims, it is also helpful to identify what warranties RMI made in connection with the flowmeters. Under the Uniform Commercial Code, a seller can make a number of warranties even without using the words "warranty" or "guarantee" and even without the specific intention to make a warranty. N.Y. U.C.C. § 2-313(2).

74. Pursuant to N.Y. U.C.C. § 2-313(1),

Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

75.  The Uniform Commercial Code also provides for two types of implied warranties.  Section 2-314 provides for an implied warranty of merchantability:

> (1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
>
> (2) Goods to be merchantable must be at least such as
>
> > (a) pass without objection in the trade under the contract description; and
> >
> > . . . .
> >
> > (c) are fit for the ordinary purposes for which such goods are used . . . .

76.  Section 2-315 of the Uniform Commercial Code also provides for an implied warranty of fitness for a particular purpose:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

N.Y. U.C.C. § 2-315.

77.  RMI made a number of warranties concerning the flowmeters that it sold to EAP.  First, as a result of its representations concerning the quality of its flowmeters, RMI made a number of express warranties.  Specifically, RMI's express warranties included its affirmation that it would provide a

"comprehensive field investigation" to "insure the best possible solution for each location and identify the system requirements for each site" (DX 167); that its equipment had a "ONE YEAR POWER SUPPLY" (DX 6; Tr. 195) and that it would provide a "Factory Technician on location to train service and installation crews" (DX 7, 8). RMI also made an express warranty in the EAP - RMI Contract when it represented that "Rocky Mountain Instruments agrees to provide a two year warranty on the flowmeters and batteries" and that it "shall extend the warranty to the satis-faction of the NYC DEP" (PX B, B1; DX 18).

78. Because RMI was a merchant[5] with respect to flowmeters, it also warranted that its flowmeters "pass without objection in the trade under the contract description" and were "fit for the ordinary purposes for which such goods are used . . . ."

---

[5]The Uniform Commercial Code defines a "merchant" as

> a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

N.Y. U.C.C. § 2-104(1). Given the nature of its business (Tr. 3), there can be no question that RMI was a merchant with respect to flowmeters.

79. RMI's conduct and representations also gives rise to an implied warranty that the flowmeters were fit for the particular purpose for which they were required.

80. Prior to entering into the contract with EAP, RMI's officials had studied and become familiar with the requirements of the consent decree, which formed the basis of the contracts between the DEP and EAP, and the contracts themselves (Tr. 25, 27, 160-61, 190, 510-13; DX 167). In addition, the contract between EAP and RMI represented that "Rocky Mountain will also ensure that the system meets NYC DEP SPECS. REG 23A and will abide by it's [sic] terms and conditions" (PX B, B1; DX 18).

81. RMI knew that EAP was relying on RMI to furnish suitable equipment. Apart from the contractual language quoted in the forgoing paragraph, there was uncontradicted testimony that RMI had superior knowledge of flowmeters and that EAP was relying on RMI to design and build units that would function properly (Tr. 168-69, 510-13, 520, 565 DX 167). RMI selected the particular components that comprised the flowmeters; EAP played no role in these decisions (Tr. 169-71, 551, 565).

82. The evidence clearly establishes that at the time the EAP-RMI contract was formed, RMI had "reason to know [the] particular purpose for which the goods [were] required and that [EAP was] relying on [RMI's] seller's skill or judgment to select or furnish suitable goods." N.Y. U.C.C. § 2-315. Thus, the

elements of an implied warranty for a particular purpose have also been established. See generally Saratoga Spa & Bath, Inc. v. Beeche Sys. Corp., 230 A.D.2d 326, 331, 656 N.Y.S.2d 787, 790 (3rd Dep't), leave to appeal denied, 90 N.Y.2d 979, 688 N.E.2d 1035, 665 N.Y.S.2d 953 (1997); Emerald Painting, Inc. v. PPG Indus., Inc., 99 A.D.2d 891, 472 N.Y.S.2d 485 (3rd Dep't 1984); Cohen v. Bratt & Doxey Supply Co., 51 A.D.2d 719, 379 N.Y.S.2d 155 (2d Dep't), leave to appeal denied, 39 N.Y.2d 706, 351 N.E.2d 437, 385 N.Y.S.2d 1025 (1976); Dempsey v. Rosenthal, 121 Misc.2d 612, 468 N.Y.S.2d 441 (N.Y.C. Civ. Ct. 1983).

83. None of the contract documents disclaim any of the warranties resulting from N.Y. U.C.C. §§ 2-313, 2-314 or 2-315 (see Tr. 188), nor is there any other evidence suggesting that the warranties resulting from these provisions were disclaimed.

D. EDC's Claims

84. EDC's first claim alleges that EAP breached the contract with RMI by failing to pay the full purchase price due for the flowmeters.

85. "In order to recover an action for the price pursuant to Section 2-709(1)(a) of the New York Uniform Commercial Code, plaintiffs must show that 1) they had a contract; 2) the buyer failed to pay the purchase price; and 3) the buyer accepted the goods." Weil v. Murray, 161 F. Supp.2d 250, 254-55

(S.D.N.Y. 2001); <u>accord</u> N.Y. U.C.C. §§ 2-607(1); 2-709(1)(a). A buyer accepts goods in a manner sufficient to trigger its liability for the purchase price only where "there has been no justified revocation of acceptance, for such a revocation means that there has been a default by the seller which bars his rights" to recover the price pursuant to N.Y. U.C.C. § 2-709(1)(a). N.Y. U.C.C. § 2-709, Official Comment 5.

86. There is no dispute that RMI and EAP had a contract nor is there any dispute that RMI failed to pay the purchase price. Thus, EDC's entitlement to the unpaid balance of the purchase price turns on whether the flowmeters were accepted by EAP.

87. "Under N.Y. U.C.C. § 2-606, acceptance of goods occurs when the buyer: (1) signifies to the seller, after a reasonable opportunity to inspect the goods, that the goods are conforming or that he will take or retain them in spite of their non-conformity; (2) fails to make an effective rejection after a reasonable opportunity to inspect the goods; or (3) does any act inconsistent with the seller's ownership." <u>Oneida Ltd. v. Redtagbiz, Inc.</u>, No. 5:01-CV-388, 2002 WL 31553529 at *5 (N.D.N.Y. Nov. 15, 2002).

88. The evidence shows that although EAP initially accepted the flowmeters, it timely and properly revoked its acceptance.

89. EAP accepted the flowmeters when it took physical possession of them and installed them in the New York City sewer system. However, during the period from April through early August, 2001, the evidence clearly shows that the meters failed to function in any meaningful way. Although EDC attempts to blame the flowmeter's failure on faulty installation by EAP and its agents, the evidence does not support this conclusion for several reasons:

a. There was no documentary evidence that the units were operable before they were released to EAP. Although there was oral testimony that quality control tests were performed when the meters left RMI's production facility and when they arrived at the pre-installation staging facility ion New Jersey, no testing protocol was offered nor was there any documentary evidence establishing that each unit had been tested and had passed.

b. EDC's evidence of misconduct by installers is anecdotal and fails to show a systemic causal relationship. Although EDC makes broad allegations that installers used sledge hammers to install units containing delicate electronic components, only one instance of the use of a sledge hammer was actually witnessed by Schaller (Tr. 325). Although he claims to have seen what he considered to be evidence of sledge hammer use on 29 units (Tr. 325), he did

not describe what that damage was nor did he explain how he was qualified to view damage to a unit and deduce its cause. To the extent EDC asserts that defective installation can be deduced from the fact that the EAP installation crews lacked necessary equipment such as buckets (used to lower equipment into manholes), voltmeters, alan keys and laptop computers (Tr. 368-70) and that on at least one occasion, a member of an installation crew used cocaine on the job (Tr. 355-56), no evidence was offered linking these alleged shortcomings to installation defects. In addition, the only installation deficiency that Schaller noted in a contemporaneous document was crews' burying antennae too deeply (Tr. 701). Schaller admitted that any defective antennae installations that he noted were promptly repaired (Tr. 412).

c. To the extent that EDC claims that the lack of rain gauges resulted in the sending of an excessive number of alarms and the accelerated depletion of the batteries, it has failed to offer evidence that there was, in fact suffi-cient rain fall in New York City in May, June and July to support this theory. In fact, statistics maintained by the National Climate Data Center[6] indicate that rainfall in New

---

[6]These statistics are judicially noticeable. See Rasgaw v. Central Vt. Ry., 133 F.2d 253, 255 (2d Cir. 1943); Chubb & Son Inc. v. Kelleher, 92 CV 4484 (CBA), 95 CV 0951 (CBA), 2006 WL 2711543 at *4 n.2 (E.D.N.Y. Sept. 21, 2006); Mamiye Bros. v.
(continued...)

York City's Central Park for May, June and July, 2001 was as follows:

May, 2001: 2.03 inches (2.39 inches below normal)

June, 2001: 5.29 inches (1.62 inches above normal)

July, 2001: 2.04 inches (2.31 inches below normal)

National Oceanic & Atmospheric Administration, <u>Climatological Data Annual Summary, New York, 2001</u>, Vol. 113, No. 13 at 4, 5. Thus, overall, the rainfall for the relevant period was below normal.

d. Finally, RMI's "IMPACT REPORT CONCERNING 'OPTIMUM' DATA LOGGERS and RE-CUR[R]ING MEMORY CHIP ISSUES," dated June 19, 2001 (DX 77) constitutes compelling evidence that the essential components of the Model 3000 were defective. The relevant portions of this document are quoted at paragraph 52, above. Of particular relevance here is that RMI does not even remotely suggest in this document that installation deficiencies were responsible for the high failure rate of the flowmeters.

90. Section 2-608 of the New York Uniform Commercial Code provides:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

---

[6](...continued)
<u>Barber S.S. Lines, Inc.</u>, 241 F. Supp. 99, 116 (S.D.N.Y. 1965).

(a) on the reasonable assumption that its
non-conformity would be cured an it has not been
seasonably cured;

. . . .

(2) Revocation of acceptance must occur within a
reasonable time after the buyer discovers or should
have discovered the ground for and before any substan-
tial change in condition of the goods which is not
caused by their own defects.  It is not effective until
the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and
duties with regard to the goods involved as if he had
rejected them.

Given RMI's failure to remedy the problems with the flowmeters

and its ultimatum in August 2001 that it would cease its attempts

to cure the problems with the flowmeters unless the outstanding

balance was paid,[7] EAP was justified in revoking its acceptance.

EAP did revoke its acceptance in early September 2001 when it

advised RMI that it was going to remove and replace the RMI

_____

[7]Although it might be argued that RMI was justified in
suspending performance on August 2, 2001 given RMI's failure to
pay the outstanding balance owed on RMI's invoices, such an
argument would be incorrect.  Commencing in June 2001 the
flowmeters began to suffer an extremely high failure rate.  This
systemic failure constituted a material breach and provided a
basis for EAP to exercise its common law right and its right
under N.Y. U.C.C. 2-609(1) to suspend performance and to demand
assurances that the deficiencies would be rectified.  See Sinco,
Inc. v. Metro-North Commuter R.R. Co., 133 F. Supp.2d 308, 311-12
(S.D.N.Y. 2001); USA Network v. Jones Intercable, Inc., 729 F.
Supp. 304, 311 (S.D.N.Y. 1990); Turntables, Inc. v. Gestetner, 52
A.D.2d 776, 777, 382 N.Y.S.2d 798, 799 (2d Dep't 1976).  EAP made
a written demand for assurances that the problems would be
rectified on August 1, 2001 (DX 125), and was justified at least
as early as that date in suspending its performance.  Thus, RMI's
August 2 repudiation of the contract cannot be justified.

flowmeters and that RMI could reclaim the flowmeters from EAP's premises (Tr. 665-66).

91. Since EAP justifiably revoked its acceptance of the flowmeters, EDC is not entitled to recover the unpaid balance of the purchase price.

92. EDC's claim for goods sold and delivered fails for the same reason that its action for the contract price fails. Where the seller delivers defective goods and the buyer properly revokes its acceptance, the seller is not entitled to recover on a theory of goods sold and delivered. Amerol Corp. v. American Chemie-Pharma Inc., CV 04-0940 (JO), 2006 WL at 721319 at *7, *10 (E.D.N.Y. Mar. 17, 2006), citing Created Gemstones, Inc. v. Union Carbide Corp., 47 N.Y.2d 250, 255-256, 391 N.E.2d 987, 990, 417 N.Y.S.2d 905, 907 (1979). Since I conclude that the flowmeters were defective and that EAP properly revoked its acceptance, this theory also fails.

93. Finally, EDC's attempt to cast its claim as a claim for an account stated fairs no better.

94. Although the case law setting forth the elements of a claim for an account stated is not entirely uniform, the cases are uniform in holding that an essential element of such a claim is absence of complaint from the debtor to the statement of the account, i.e., a claim for an account statement requires evidence that the debtor accepted, either explicitly or by his

actions, the account as being correct.  <u>Leepson v. Allen Riley</u>
<u>Co.</u>, 04 Civ. 3720 (LTS)(AJP), 2006 WL 2135806 at *4 (S.D.N.Y.
July 31, 2006); <u>Sony Music Entm't Inc. v. Kall</u>, 01 Civ. 3130
(NRB), 2001 WL 1356201 at *2 (S.D.N.Y. Nov. 2, 2001); <u>LLT Int'l</u>
<u>Inc. v. MCI Telecomm. Corp.</u>, 69 F. Supp.2d 510, 516 (S.D.N.Y.
1999); <u>Pat Pellegrini Flooring Corp. v. Serota</u>, 20 Misc. 3d 138A,
2008 WL 2832133 at *2 (Sup. Ct. App. T. July 10, 2008).  Given
the numerous communications between EAP and RMI during May, June
and July, 2001 concerning the faults in the flowmeters, I find
that EDC has not proven that EAP ever agreed, either explicitly
or by its actions, that the invoices submitted by RMI were
correct.

    E.  <u>EAP's Counterclaims</u>

    95.  EAP's first counterclaim is for breach of con-
tract.

    96.  The EAP/RMI Agreement provided, in pertinent part:

> The above referenced purchase order is for a <u>complete</u>
> <u>and operational system</u>.  This system consists of all
> hardware and software (less personal computers) needed
> to form a <u>fully functional system</u>.  This system will
> consist of 38 flowmeters with full telecommunication
> capability.  Rocky Mountain shall also <u>ensure that the</u>
> <u>system meets NYC DEP SPECS. REG 23A and will abide by</u>
> <u>it's terms and conditions</u>.

(PX B, B1; DX 18 (emphasis added)).

    97.  Although there was some evidence that the system
was complete and operational at the end of May (Tr. 474-75), this

status was transitory.  As noted above, by July 25, 2001, only 13% of the flowmeters were working (PX AA, Y; see also Tr. 705; DX 57, 89, 136A).  By August, only seven flowmeters were working (DX 136A; Tr. 730-33).  RMI does not even claim that the system was operational as of August 2, 2001 (Tr. 244).  Thus, RMI breached its contract by failing to provide a fully functional contract.  For the reasons set forth at paragraphs 49-55, above, EDC's attempt to assign blame for the system's failure to EAP is unconvincing.

98.  RMI also breached its contract with EAP in a number of other ways.  RMI had promised that it would provide a "comprehensive field investigation" "[to] identity the exact equipment requirements for this project" (DX 167).  RMI admitted that it never did this, and that at best, its "field investigation consisted of two sites" only (Tr. 191-92) and conceded that "[t]wo out of 102 wouldn't be comprehensive by any definition." (Tr. 192).

99.  RMI also expressly represented that it would provide a "Factory Technician on location to train service and installation crews" (DX 7, 8).  However, Schaller, the only RMI representative in the New York area bluntly denied that he had any responsibility to provide any training for EAP's crews (Tr. 390).

100.  RMI also breached its contract with EAP by
failing  to provide periodic reports.  EAP never received any
reports, monthly or otherwise (Tr. 589, 708).  RMI conceded that
it never furnished any reports for June, July or August 2001 (Tr.
200).  Although RMI claimed that a report was prepared for May
2001, it was never produced in the litigation (Tr. 204-05), and,
even if it existed, would be insufficient to meet the require-
ments of the contract.

101.  RMI also breached its express warranties.  As
noted above, RMI's express warranties included warranties that
the flowmeters would have a one-year power supply, that the
flowmeters and batteries would have a two year warranty.  RMI's
abandonment of the project in August 2001 constituted a breach of
these warranties.  On August 2, 2001, RMI expressly repudiated
its warranty obligations by stating it would no longer provide
any support for the flowmeters unless it was paid in advance (PX
CC).

102.  RMI also breached its warranty of merchantabil-
ity.  Merchantability "'does not mean that the product will
fulfill [a] buyer's every expectation' (1 White and Summers,
Uniform Commercial Code § 9-8, at 476 [Practitioner's 3d ed.] ).
Rather, it has been observed, such a warranty 'provides for a
minimal level of quality'(Skelton v. General Motors Corp., 500 F.
Supp. 1181, 1191, revd on other grounds 660 F.2d 311)."  Denny v.

Ford Motor Co., 87 N.Y.2d 248, 258 n.4, 662 N.E.2d 730, 736 n.4, 639 N.Y.S.2d 250, 256 n.4 (1995); accord Henry v. Rehab Plus Inc., 404 F. Supp.2d 435, 443 (E.D.N.Y. 2005) ("The product must be 'fit for the ordinary purposes for which such goods are used.'").

103. Even judged by this modest standard, the flowmeters were not merchantable. The flowmeters were clearly intended to function for a substantial period of time; RMI's two-year express warranty establishes this fact. Their high failure rate, coming literally within weeks of their installation, establishes that they were not merchantable.

104. By failing to provide functioning flowmeters that RMI also breached its warranty of fitness for a particular purpose. Where, as here, a product is not purchased for any of its aesthetic qualities, the product is fit for its purpose when a reasonable person would be satisfied with its performance. See Alper Blouse Co. v. E.E. Connor & Co., 309 N.Y. 67, 70-71, 127 N.E.2d 813, 815 (1955). Although reasonable minds might differ as to whether the flowmeters should have lasted five years or ten years, no reasonable person would be satisfied with the system-wide failure the flowmeters experienced within eight weeks of their installation. Accordingly, RMI also breached its warranty of fitness for a particular use.

105. N.Y. U.C.C. § 2-711 provides:

(1) Where the seller fails to make delivery or
repudiates or the buyer rightfully rejects or justifi-
ably revokes acceptance then with respect to any goods
involved, and with respect to the whole if the breach
goes to the whole contract (Section 2-612), the buyer
may cancel and whether or not he has done so may in
addition to recovering so much of the price as has been
paid

    (a) "cover" and have damages under the next
    section as to all the goods affected whether or
    not they have been identified to the contract; or

    (b) recover damages for non-delivery as pro-
    vided in this Article (Section 2-713).

106.  Pursuant to paragraph 1 of Section 2-711, EAP is
entitled to the return of its partial payment of $399,000.00.

107.  EAP is also entitled to "cover" damages.  How-
ever, cover damages are not, as EAP claims, the cost of the
replacement system.

108.  N.Y. U.C.C. § 2-712 defines cover damages as
follows:

(1) After a breach within the preceding section
the buyer may "cover"  by making in good faith and
without unreasonable delay any reasonable purchase of
or contract to purchase goods in substitution for those
due from the seller.

(2) The buyer may recover from the seller as
damages the _difference_ between the cost of cover and
the contract price together with any incidental or
consequential damages as hereinafter defined (Section
2-715), but less expenses saved in consequence of the
seller's breach.

(Emphasis added.)  Thus, cover damages are not simply the cost of
the replacement flowmeters.  Rather, cover damages are measured
by the _difference_ between the cost of the replacement goods and

the contract price of the goods. Simply awarding EAP the cost of the replacement flowmeters would give EAP a windfall because it would provide EAP with a flowmeter system at no cost while simultaneously relieving EAP of its obligations under its contract with RMI. Thus, such a recovery would leave EAP in a better position than it would have been in had RMI fully performed the contract.

109. In this case, EAP's cost to remove the RMI system and replace it totaled $712,407.25 (DX 162; Tr. 595). The total of the invoices RMI submitted to EAP is $1,074,190 (DX D1-D11). Since the cost of cover was less than the contract price, EAP has no cover damages.

110. EAP also incurred $129,424.25 in unreimbursed expenses servicing RMI's system (DX 162; Tr. 595). EAP is entitled to recover these costs as incidental damages pursuant to N.Y. U.C.C. § 2-715(1).

111. EDC is an assignee of RMI (PX NN). Subject to certain exceptions not applicable here, "the claim of an account debtor against an assignor may be asserted against an assignee . . . only to reduce the amount the account debtor owes." N.Y. U.C.C. § 9-404(b).[8] In other words, N.Y. U.C.C. § 9-404(b), "generally does not afford the account debtor the right to an

_____

[8]An account debtor is defined as "a person obligated on an account . . .," N.Y. U.C.C. § 9-102, and with respect to the rights assigned to EDC, EAP is the account debtor.

affirmative recovery from an assignee." N.Y. U.C.C. § 9-404, Official Comment 3; see generally Bank Leumi Trust Co. v. Collins Sales Serv., Inc., 47 N.Y.2d 888, 890, 393 N.E.2d 468, 469, 419 N.Y.S.2d 474, 475 (1979).[9]  Thus, pursuant to Section 9-404(b), EAP can assert its counter claims only to reduce the amount of any claim EDC would otherwise have against it.  Marine Midland Bank, N.A. v. Murray Walter, Inc., 101 A.D.2d 691, 692, 475 N.Y.S.2d 679, 680 (4th Dep't 1984).

112.  Accordingly, if EDC had been entitled to any affirmative recovery, EAP would be entitled to a set off equal to the sum of $399,000.00 and $129,424.25, to wit, $528,424.25.

F.  Attorney's Fees

113.  Both sides also seek attorney's fees pursuant to N.Y. St. Fin. L. § 137(4)(c) which provides:

> In any action on a payment bond furnished pursuant to this section, any judgment in favor of a subcontractor or material supplier may include provision for the payment of interest upon the amount recovered from the date when demand for payment was made pursuant to the labor and material payment bond and provided further that the court may determine and award reasonable attorney's fee to either party to such action when, upon reviewing the entire record, it appears that

---

[9]The pertinent portion of N.Y. U.C.C. § 9-404 was formerly codified at N.Y. U.C.C. § 9-318 and was recodified in 2001.  See Disposition Table, Vol. 62 1/2 McKinney's Consolidated Laws of New York, U.C.C. §§ 7-101 to 9-400, at 301-02 (MicKinney 2002).  Thus, pre-2001 case law concerning former Section 9-318 is material to the provisions currently codified at Section 9-404.

either the original claim or the defense interposed to such claim is without substantial basis in fact or law.

114.  The case law discussing what a "substantial basis" is within the meaning of this provision is sparse.  The most expansive discussion I have found is set forth in <u>Beninati Roofing & Sheet Metal Co. v. Gelco Builders, Inc.</u>, 279 A.D.2d 412, 412-13, 720 N.Y.S.2d 37, 38 (1st Dep't 2001):

> [W]hile an unsuccessful defense alone does not suffice as a basis for an award of attorneys' fees under State Finance Law § 137 (4) (c) (<u>see</u>, Northeast Caissons v Columbus Constr. Corp., 268 AD2d 512; <u>Conesco Indus. v St. Paul Fire & Mar. Ins. Co.</u>, 210 AD2d 596, <u>lv</u> <u>denied</u> 85 NY2d 809), the trial court properly found that defendant surety's arguments were without substantial basis since there was no plausible ground for its claim that the change order in question was not issued pursuant to the covered contract, and given that finding, the award  of attorneys' fees pursuant to State Finance Law § 137 (4) (c) was appropriate.

<u>See</u> <u>also</u> <u>Precision Stone, Inc. v. Arch Ins. Co.</u>, 472 F. Supp.2d 577, 582 (S.D.N.Y. 2007) (unavailing position may, nevertheless, have a substantial basis); <u>Cleveland Wrecking Co. v. Nova Cas. Co.</u>, 00-CV-1003E(SC), 2001 WL 1823604 at *4 (W.D.N.Y. Nov. 21, 2001) (same).

115.  Although I find EDC's claims to be unavailing, I cannot conclude that they lack any plausible basis.  It does not appear that the installation of the units was flawless.  Accordingly, I decline to award attorney's fees to EAP pursuant to Section 137.

IV. Conclusion

Accordingly, for all the foregoing reasons, I conclude
that defendants are entitled to judgment on all of plaintiff's
claims against them and that those claims are hereby dismissed
with prejudice. EAP's counterclaims are dismissed because EAP
cannot affirmatively recover on those counterclaims from EDC.
The application for attorneys fees is also denied.

I also express my gratitude to counsel for both sides
for the excellence of their presentations of a factually complex
case and for their consistently professional conduct. The care
and attention to detail that went into both sides' oral presenta-
tions and written submissions was obvious and was deeply appreci-
ated.

Dated: New York, New York
       November 14, 2008

                            SO ORDERED


                            HENRY PITMAN
                            United States Magistrate Judge

Copies mailed to:

Edward J. Sheats, Esq.
Sheats & Associates, P.C.
9646 Brewerton Road
P.O. Box 820
Brewerton, New York  13029

Andrew P. Saulitis, Esq.
555 Madison Avenue
New York, New York  10022-3301